UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- x
                               :

XIZMO MEDIA PRODUCTIONS LLC,      :
                               :      <u>MEMORANDUM AND ORDER</u>

              Plaintiff,      :

                               :      21-cv-2160 (ENV) (MMH)

              v.                :

                               :
CITY OF NEW YORK,                    :

                               :
                  Defendant.    :
------------------------------------------------------- x

VITALIANO, D.J.

      On April 20, 2021, plaintiff Xizmo Media Productions LLC ("Xizmo"), an aerial

cinematography production company, filed this action for declaratory and injunctive relief

against defendant City of New York ("the City") claiming that New York City Administrative

Code § 10-126(c) effectively bans the operation of unmanned aerial vehicles ("UAVs" or

"drones") in New York City and is thereby preempted by federal law.  Compl., Dkt. 1.  Plaintiff

also alleges that § 10-126(c) violates the First Amendment by excessively restricting the right to

artistic expression through aerial filmmaking.  Presently before the Court is the City's motion to

dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  Def. Mot., Dkt. 17.

For the reasons that follow, the City's motion is denied.

Background[1]

      Xizmo is a Brooklyn-based production company specializing in aerial cinematography

using UAVs.  Compl. ¶¶ 1, 31.  In 2016, Xizmo obtained a Federal Aviation Administration

---

[1] The facts are drawn from the complaint and taken as true, with all reasonable inferences drawn
in plaintiff's favor, as they must be on a motion to dismiss.  *Vietnam Ass'n for Victims of Agent
Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008).

("FAA") remote pilot certification pursuant to FAA regulations.  *Id.* ¶¶ 24, 35.  In the following

years, Xizmo also received various FAA waivers exempting it from certain federal UAV

operation restrictions.  *Id.* ¶¶ 36–38.  Specifically, in 2017, it obtained an exemption from 14

C.F.R. § 107.29 to allow nighttime small UAV operation, *id.* ¶ 36, and in 2018, it obtained

authorization to operate small UAVs in class B airspace under the jurisdiction of air traffic

control at New York's John F. Kennedy ("JFK") and LaGuardia airports, *id.* ¶ 38.  Finally, in

2019, plaintiff obtained an exemption from 14 C.F.R. § 107.39(a) to allow small UAV operation

over human beings who are not direct participants.  *Id.* ¶ 37.

Xizmo alleges that, despite its FAA certificate and various waivers, its aerial productions

have been shut down on multiple occasions by the New York City Police Department ("NYPD")

pursuant to New York City Administrative Code § 10-126(c) (the "Avigation Law").  *Id.* ¶ 39.

Originally adopted in 1948, that local law currently provides:

> It shall be unlawful for any person avigating an aircraft to take off or land, except
> in an emergency, at any place within the limits of the city other than places of
> landing designated by the department of transportation or the port of New York
> authority.

Within this context, "aircraft" means "[a]ny contrivance, now or hereafter invented for avigation

or flight in the air . . .," N.Y.C. Admin. Code § 10-126(a)(1), including drones.  "Limits of the

city" is defined as "[t]he water, waterways and land under the jurisdiction of the city and the air

space above same."  *Id.* § 10-126(a)(3).  And "avigate" means "[t]o pilot, steer, direct, fly or

manage an aircraft in or through the air, whether controlled from the ground or otherwise."  *Id.* §

10-126(a)(4).

Recognizing that the Avigation Law was enacted before drones existed and, on its face,

targets only takeoffs and landings, plaintiff asserts nevertheless that the City has adopted an

expansive interpretation of it, effectively prohibiting all drone use in New York City and, in

particular, in Manhattan air space.  Compl. ¶¶ 1, 13–14.  Faced with what it perceived to be a substantial threat to its business, Xizmo initiated this action on April 20, 2021, seeking (1) a declaration that the Avigation Law violates the Supremacy Clause, (2) a declaration that the Avigation Law violates the First Amendment, and (3) a declaration that the City of New York recognize remote pilot certificates and waivers issued by the FAA.

To put more meat on the bones of the complaint, in its first claim, plaintiff contends that the Avigation Law is preempted by federal law under the doctrines of (a) field preemption, because the FAA prescribes rules "concerning every facet of UAV operation," and (b) conflict preemption, because the Avigation Law directly conflicts with the FAA's (1) authorization of UAV usage pursuant to 14 C.F.R. § 107, (2) control of class B airspace, and (3) power to grant remote pilot certifications and waivers.  *Id.* ¶¶ 26, 44.  For its second cause of action, Xizmo alleges that piloting UAVs for filmmaking is a protected form of artistic expression, and that the Avigation Law cannot withstand intermediate scrutiny because it is not narrowly tailored to fulfill a significant government interest and does not leave suitable alternative avenues of cinematographic expression available.  *Id.* ¶ 47–60.  The City now moves to dismiss both counts for failure to state a claim under Rule 12(b)(6).  Def. Mem., Dkt. 18.

<u>Legal Standard</u>

To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007)).  This "plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (internal quotations omitted).

The district court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party. *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008). However, the Court need not credit any "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. And, although a litigant is not required to supply "detailed factual allegations" in support of its claims, *Twombly*, 550 U.S. at 555, it must allege "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678.

Discussion

I.    Preemption Claim

The Supremacy Clause of the United States Constitution establishes that federal laws are supreme. U.S. Const. art. VI, cl. 2. Empowered by this Clause, Congress has been granted the authority to preempt state law, *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1896), and "state laws that conflict with federal law are without effect," *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76, 129 S. Ct. 538, 172 L. Ed. 2d 398 (2008) (cleaned up). Both federal statutes and federal regulations have preemptive power, *see Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982), including over local ordinances, *see City of Ladue v. Gilleo*, 512 U.S. 43, 50, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994).

Express preemption occurs when explicit statutory language "directs that state law be ousted." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008). Even in the absence of express preemption by Congress, however, a state or local law may still be preempted under the doctrines of conflict or field preemption. *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 713, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985). Field preemption

4

occurs when states regulate in a field that Congress has lawfully determined to be subject to its exclusive regulation. *Arizona v. United States*, 567 U.S. 387, 399, 132 S. Ct. 2492, 183 L. Ed. 2d 351 (2012). Conflict preemption arises in "cases where compliance with both federal and state regulations is a physical impossibility" as well as "instances where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (cleaned up). In this case, Xizmo does not claim that there is an express preemption clause in the relevant federal statutes or FAA regulations, but instead contends that federal law occupies the entire field of professional UAV operation and that the Avigation Law is incompatible with FAA regulation of that field. Compl. ¶¶ 26, 44.

      A.   <u>The FAA</u>

      At the outset, a brief review of the federal scheme governing UAVs is a necessary precursor to the Court's preemption analysis. Pursuant to the Air Commerce Act of 1926, "[t]he United States Government has exclusive sovereignty of airspace in the United States." 49 U.S.C. § 40103(a)(1). That statute also vests with the FAA the authority to promulgate regulations for, *inter alia*, "navigating, protecting, and identifying aircraft," "protecting individuals and property on the ground," and "using the navigable airspace efficiently." *Id.* § 40103(b)(2)(A)–(C). In 2012, Congress also passed the FAA Modernization and Reform Act ("FMRA"), which directed the FAA to "develop a comprehensive plan to safely accelerate the integration of civil unmanned aircraft systems into the national airspace system." Pub. L. No. 112-95, § 332, 126 Stat. 11, 73 (2012) (codified at 49 U.S.C. § 44802(a)(1)). That plan was to include, at minimum, recommendations on "a phased-in approach to the integration of civil unmanned aircraft systems into the national airspace system" and the "establishment of a process to develop certification, flight standards, and air traffic requirements for civil unmanned aircraft systems." 49 U.S.C. § 44802(a)(2)(F).

The FAA responded by promulgating 14 C.F.R. § 107, which allows qualified individuals to obtain permits for small UAV operation and seek waivers from the FAA "authorizing a deviation from any regulation specified in 107.205."  14 C.F.R. § 107.200.  It also imposes several notable restrictions on small UAV use.  For instance, a small UAV operator must register the aircraft with the FAA, *id.* §§ 91.203, 107.13, ensure that the remote pilot or designated visual observer maintain line of sight with the aircraft, *id.* § 107.31, and fly the aircraft within 400 feet of ground level or a structure, *id.* § 107.51.

B.    Field Preemption

In light of this broad, encompassing grant of authority, Xizmo asserts that the comprehensiveness of federal law relating to aviation safety for UAV operation evinces a national intent to fully occupy the field.  Compl. ¶¶ 26, 44.  An intent by Congress to make such a determination may "be inferred from a framework of regulation so pervasive . . . that Congress left no room for states to supplement it or where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (quotations omitted).

Applied to this case, while Congress's extensive control in the field of civil aviation is beyond dispute, nothing in the FMRA or FAA regulations suggests a federal intent to completely occupy the field of UAV operation and safety.  The general declaration in 49 U.S.C. § 40103(a)(1) that "[t]he United States Government has exclusive sovereignty of airspace in the United States" is simply too vague to establish a sufficiently dominant interest in all areas of UAV regulation.  To the contrary, statements by the FAA suggest the exact opposite, expressly acknowledging that some state and local regulation in this field is anticipated.  For instance, the FAA has stated:

[C]ertain legal aspects concerning small [UAV] use may be best addressed at the State or local level. . . . The Fact Sheet provides examples of State and local laws affecting [UAVs] for which consultation with the FAA is recommended and those that are likely to fall within State and local government authority. . . . The Fact Sheet also notes that laws traditionally related to State and local police power— including land use, zoning, privacy, trespass, and law enforcement operations— generally are not subject to Federal regulation.[2]

Relying on these very same statements, other courts have determined that "the FAA explicitly contemplates state or local regulation of pilotless aircraft, defeating" any possibility "that the whole field is exclusive to the federal government." *Singer v. City of Newton*, 284 F. Supp. 3d 125, 130 (D. Mass. 2017).

Xizmo attempts to discount these clear pronouncements by arguing that the FAA guidance is nuanced and was not intended to, nor did it, broadly authorize state and local UAV flight regulation. Pl. Opp. Mem., Dkt. 19, at 7. But field preemption is an all-or-nothing inquiry; it arises if Congress has developed "a framework of regulation so pervasive . . . that Congress left *no room* for states to supplement it." *Arizona*, 567 U.S. at 399 (emphasis added). It therefore follows that if *some* state regulation was expressly contemplated, field preemption would not be activated.[3]

Equally unavailing are plaintiff's attempts to narrowly characterize *Singer*'s denial of field preemption as particular to federal regulation in the field of UAV operations for "hobbyists," not "professional" UAV operators like plaintiff. Pl. Opp. Mem. at 7. The *Singer*

---

[2] 81 Fed. Reg. 42063, 42194 (June 28, 2016) (citing *State and Local Regulation of Unmanned Aircraft Systems (UAS) Fact Sheet*, FAA (Dec. 17, 2015), https://www.faa.gov/uas/resources/policy_library/media/UAS_Fact_Sheet_Final.pdf [hereinafter FAA Fact Sheet]).

[3] Plaintiff points out that the FAA guidance recommends consultation with the FAA for certain state and local laws affecting UAVs, such as flight path restrictions and "operational bans." FAA Fact Sheet at 3. But even assuming, as plaintiff contends, that the City failed to follow this suggestion with respect to the Avigation Law, this does not mean the City violated the FRMA or FAA regulations and, more to the point, has no impact on the absence of field preemption.

court made no distinction between hobbyists and professionals and relied on FAA statements which similarly made no such distinction. Accordingly, Xizmo's first cause of action cannot rest on a field preemption foundation.

C.     Conflict Preemption

Plaintiff's second alleged basis for preemption requires closer inspection. Xizmo contends that the Avigation Law, operating as a total UAV ban in the City, is preempted by FAA regulations pursuant to the doctrine of conflict preemption because (1) the City imposes fines under the Law without regard to compliance with UAV certifications or waivers, (2) the Law conflicts with FAA control of Class B airspace, and (3) the Law conflicts with the FAA's power to grant remote pilot certifications and waivers. Compl. ¶ 44. Put differently, as plaintiff sees it, Xizmo cannot possibly conduct its business within the authority granted to it by the FAA under that agency's regulations without violating the Avigation Law and, thus, the Avigation Law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting the FMRA. *Arizona*, 567 U.S. at 399.

The City counters that plaintiff "grossly mischaracterizes" the Avigation Law by claiming it operates as a complete UAV ban. Def. Mem. at 7. Rather, according to the City, the Law merely regulates the places that UAVs can take off and land, an aspect of UAV use which the federal regulatory scheme does not expressly cover. *Id.*

Yet, when viewed in conjunction with the panoply of the FAA's existing regulation of UAV flight, and the mission Congress gave it when the FMRA was enacted, the full, restrictive effect of the Avigation Law is made plain. Most significantly, the FAA has imposed visual line of sight requirements under which UAVs must be flown in a manner that allows "the remote pilot in command, the visual observer (if one is used), and the person manipulating the flight control of the" UAV to see it at all times, without the aid of a visual device. 14 C.F.R. §

107.31(a).  This regulation, combined with the Avigation Law's restriction on takeoffs and landings outside of legally designated areas, effectively prohibits UAV use outside of the immediate visual radius of those City-authorized zones.  Reduced to the elemental, the Avigation Law's effect is to disallow UAV flight in any airspace in which a UAV cannot be seen from one of the City's specifically designated areas, notwithstanding FAA certification and waivers that would permit UAV use elsewhere in the City.

The City points out that, even with the line of sight restriction, the Avigation Law cannot be deemed a "complete ban" on UAV use because it permits takeoffs and landings at places "designated by the department of transportation or the port of New York authority," and several such sites exist within the City limits.  Def. Mem. at 7.  In support, the City cites to a webpage, titled "Model Aircraft Fields," on the New York City Parks & Recreation Department website.[4] This website lists five public parks—two in Brooklyn, two in Queens, and one on Staten Island—that, according to the City, are approved UAV takeoff and landing zones.  Nonetheless, nothing on the website suggests that these five locations are, in fact, approved UAV zones.  It describes the parks as "model aircraft fields," and does not mention UAVs a single time.  Without proceeding to discovery, it is unclear if these zones are even suitable for UAV use, let alone properly "designated" sites within the meaning of the Avigation Law.[5]

---

[4] *See* Def. Mem. at 7 (citing *Model Aircraft Fields*, N.Y.C. DEP'T OF PARKS & REC., https://www.nycgovparks.org/facilities/modelaircraftfields).

[5] The City's position is further confounded by its own municipal rules and regulations:

> No person shall voluntarily bring, land or cause to alight within or upon any park, any airplane, hot air balloon, parachute, hang glider, or *other aerial device*, except that certain areas may be designated appropriate landing places for medical evacuation helicopters.

21 N.Y. Comp. Codes R. & Regs. § 9003.10 (emphasis added).  If drones are "aerial devices" within the meaning of this regulation, then their use is prohibited even in these supposedly approved takeoff and landing sites.

At any rate, even assuming *arguendo* that these sites are designated places of takeoff and landing within the meaning of the Avigation Law, there are only five in all of New York City, and not one is located in or around Manhattan.  The closest is Forest Park in Queens, which is located about 5 miles from the island of Manhattan.  *A fortiori*, then, the result would still be an effective prohibition of UAV operation anywhere in or immediately surrounding Manhattan.

Significantly, plaintiff's characterization of the Avigation Law as a categorical ban on drone use is rendered even more plausible by the City's own proclamations.  For instance, the webpage titled "Drones" on the City's official website—which consists of only three sentences—states: "Call 911 to report a drone in use in New York City . . . It is illegal to fly them in New York City."[6]  Likewise, the "Official Motion Picture – Television Permit" issued by the Mayor's Office of Media & Entertainment to Xizmo unequivocally states: "UNMANNED AIRCRAFT (DRONES) ARE PROHIBITED IN NEW YORK CITY."  Pl. Ex. F, Dkt. 20-6. This evidence is also consistent with plaintiff's allegation that, on multiple occasions, its aerial productions have been shut down by NYPD, notwithstanding its possession of a FAA certificate and the appropriate waivers.  Compl. ¶ 39.

On this point, the District of Massachusetts' decision in *Singer v. City of Newton*—the only case of which this Court is aware that addresses conflict preemption in the UAV context— is instructive.  *Singer* involved a municipal ordinance of the city of Newton, Massachusetts, that prohibited, *inter alia*, UAV flights below an altitude of 400 feet over private property without the property owner's permission and UAV flights at any altitude over public property without permission from the city of Newton.  284 F. Supp. 3d. at 131.  In finding that the ordinance was preempted by FAA regulations, the court explained that these two provisions worked together

---

[6] *See Drones*, CITY OF N.Y., https://portal.311.nyc.gov/article/?kanumber=KA-01541.

"to create an essential ban on drone use within the limits of Newton." *Id.* This was especially true, the district court explained, in light of 14 C.F.R. § 107.51, which prohibits flight *above* 400 feet. *See id.* at 132. The *Singer* court thus concluded that Newton's restrictions "work[ed] to eliminate any drone use in the confines of the city, absent prior permission," thereby "thwart[ing] not only the FAA's objectives, but also those of Congress for the FAA to integrate drones into the national airspace." *Id.* Accordingly, it held that while "Congress and the FAA may have contemplated co-regulation of drones to a certain extent, this hardly permits an interpretation that essentially constitutes a wholesale ban on drone use in Newton." *Id.*

So too here. Though the actual effect of the Avigation Law on drone use must be parsed out in discovery, based on the facts alleged, it is entirely plausible that the Law, especially when viewed in tandem with the FAA's line of sight restriction, operates as "a wholesale ban on drone use" that impedes the FAA's and Congress's ability to safely and effectively integrate UAVs into the national airspace.

For this same reason, Xizmo has also sufficiently alleged that the Avigation Law conflicts with the FAA's control of Class B airspace. The City, for its part, contends that the Avigation Law cannot be preempted on this ground because it does not regulate any airspace at all, let alone Class B airspace. However, as just explained, that interpretation ignores both the City's proclaimed intention to outlaw UAVs and the Law's critical interaction with the FAA's line of sight restriction. The majority of New York City airspace is Class B, *see* Kostakis Aff., Dkt. 20, at ¶ 15, and the Avigation Law effectively disallows flight in a substantial amount (if not all) of that airspace.[7] This conflict thus has the immediate consequence of rendering

---

[7] It is not lost on the Court that the ordinance in *Singer*, unlike the Avigation Law, explicitly regulated the navigable airspace, thereby generating an even clearer conflict. However, contrary to the City's assertion, the *Singer* court did not predicate its conflict preemption holding solely— or even primarily—on this fact. Instead, and as noted, the conflict preemption conclusion was

Xizmo's Class B flight authorization from the FAA essentially meaningless, further impeding FAA and congressional objectives.

Finally, because the Law renders FAA remote pilot certifications and waivers effectively meaningless, Xizmo has also plausibly alleged that it conflicts with the FAA's power to grant such authorizations. Again, both Xizmo's FAA remote pilot certifications, which authorize UAV flight pursuant to the strictures of 14 C.F.R. § 107, and its waivers, which allow nighttime UAV operation and operation over persons who are not direct participants, are devoid of any effect in the city where UAV flight is prohibited, except, possibly, in an infinitesimal spec of its air space. Thus, to the extent that certifications and waivers are nullified, the Avigation Law again "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," particularly considering the FMRA's goal of facilitating drone usage. *Arizona*, 567 U.S. at 399; *see also Singer*, 284 F. Supp. 3d at 132–33 (finding that local line of sight ordinance was preempted because it "limit[ed] the methods of piloting a drone beyond that which the FAA has . . . designated").

Nor is this conclusion affected by the New York County Criminal Court's decision in *People v. Santoriello*, 180 Misc. 2d 533, 689 N.Y.S.2d 388 (N.Y.C. Crim. Ct. 1999). In that case, the same Avigation Law challenged by Xizmo—New York City Administrative Code § 10-126(c)—was found to be consistent with FAA regulations and therefore constitutional as applied to the defendant who possessed waivers from the FAA that permitted him to operate a parasail over the Hudson River. 689 N.Y.S.2d at 390. In so holding, the court explained that § 10-126(c) did not conflict with the plaintiff's parasail waivers because the waivers did not address take-offs or landings. *Id.* Significantly, however, the plaintiff in that case did not argue that the law

---

based on the fact that the ordinance, because of its interaction with FAA regulations, operated as an effective ban on drone use. *Singer*, 284 F. Supp. 3d at 131–32.

operated in practice as a wholesale ban on parasailing, nor did he assert that parasails are subject to the line of sight restriction of 14 C.F.R. § 107.31.  As already stressed, it is the application of the Law, as well as its interaction with FAA regulation, that plausibly generates a conflict with federal regulations and impedes the federal government's ability to integrate UAVs into the national airspace system.[8]

To summarize, although it remains to be seen whether the Avigation Law actually conflicts with federal law, such a finding is clearly plausible—and, indeed, upon a plain reading of the applicable regulations and the City's website, is likely—under the facts alleged. Accordingly, Xizmo may proceed with its first claim on a conflict preemption basis, and defendant's motion to dismiss count one is denied.

II.    First Amendment Claim

In its second and final cause of action, Xizmo alleges that the Avigation Law violates its First Amendment rights.  For this to be true, plaintiff must plausibly allege that (1) its UAV filmmaking is protected expressive activity, and (2) the Avigation Law, as an indisputably content neutral ordinance, cannot withstand intermediate First Amendment scrutiny.  *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 90–91, 97 (2d Cir. 2006).

---

[8] The City also argues that the Avigation Law, by only targeting takeoffs and landings, essentially regulates land use—a sphere traditionally reserved for state and local governments and not subject to federal regulation.  Def. Mem. at 7–8.  This argument, however, still fails to take into account the practical effect of the Avigation Law on drone usage.  Further, the cases cited in support of this argument are easily distinguishable, as they are much more fundamentally related to land use than the silent takeoff or landing of a small UAV.  *See Condor Corp. v. City of St. Paul*, 912 F.2d 215 (8th Cir. 1990) (operation of a heliport); *Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 681 F. Supp. 2d 182 (D. Conn. 2010), *aff'd*, 634 F.3d 206 (2d Cir. 2011) (removal of trees located in protected wetlands near an airport); *Gustafson v. City of Lake Angelus*, 76 F.3d 778 (6th Cir. 1996) (landing of seaplanes); *Broadbent v. Allison*, 155 F. Supp. 2d 520 (W.D.N.C. 2001) (construction of airports); *Tanis v. Twp. of Hampton*, 704 A.2d 62 (N.J. Super. Ct. App. Div. 1997) (use of private landing strips).

13

A.    <u>Expressive Activity</u>

It has long been established that "expression by means of motion pictures is included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502, 72 S. Ct. 777, 96 L. Ed. 1098 (1952). Fundamentally, "motion pictures are a significant medium for the communication of ideas" that "affect public attitudes and behavior in a variety of ways," regardless of whether they are designed to entertain or to inform. *Id.* at 501.

Here, however, Xizmo's allegedly curtailed expression is not a film itself, but rather the *act of filming* a motion picture or television program through use of UAVs. While some circuits have recognized that the First Amendment "protects the act of making film," neither the Supreme Court nor this Circuit has explicitly held the same. *Turner v. Lieutenant Driver*, 848 F.3d 678, 689 (5th Cir. 2017); *see also American Civil Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012); *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010).

At the same time, the Supreme Court has made it unequivocally clear that "the Constitution looks beyond written or spoken words as mediums of expression." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569, 115 S. Ct. 2338, 132 L. Ed. 2d 487 (1995). But because there is "some kernel of expression in every activity a person undertakes," *City of Dallas v. Stanglin*, 490 U.S. 19, 25, 109 S. Ct. 1591, 104 L. Ed. 2d 18 (1989), First Amendment protection extends "only to conduct that is inherently expressive," *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006). Applying these principles, the Court has found that inherently expressive conduct such as nude dancing, *see City of Erie v. Pap's A.M.*, 529 U.S. 277, 289, 120 S. Ct. 1382, 146 L. Ed. 2d 265 (2000), the selection and transmission of cable television programs,

14

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994), and the selection of parade contingents, *Hurley*, 515 U.S. at 570, is entitled to First Amendment protection.

Tasked to determine if particular conduct is sufficiently expressive to implicate the First Amendment, the Court has historically asked "whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Texas v. Johnson*, 491 U.S. 397, 404, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989) (cleaned up).  More recently, however, the Court has eased away from a strict particularized message requirement, holding that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a particularized message, would never reach the unquestionably shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." *Hurley*, 515 U.S. at 569 (cleaned up).

Under this framework, plaintiff has sufficiently alleged that its use of drones for aerial cinematography is expressive activity protected by the First Amendment.  Although, as noted, the Second Circuit has never explicitly held that filmmaking is expressive speech, such a rule is plainly consistent with—if not mandated by—the "Supreme Court's First Amendment jurisprudence protecting not only the final form of expression, but also its medium and the iterative steps used in the creative process." *Price v. Barr*, 514 F. Supp. 3d 171, 185 (D.D.C. 2021).  Indeed, as stated by the Supreme Court, "regulation of a medium inevitably affects communication itself." *Gilleo*, 512 U.S. at 48; *see also Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557–58, 95 S. Ct. 1239, 43 L. Ed. 2d 448 (1975) ("By its nature, theater . . . frequently mixes speech with live action or conduct. But that is no reason to hold theater subject to a drastically different standard.").  Thus, although filmmaking—like writing or

15

painting—could be reduced to its "constituent acts" and assessed through the lens of "expressive conduct," the Supreme Court has never "attempted to disconnect the end product from the act of creation." *Anderson*, 621 F.3d at 1061–62.  To hold that aerial filmmaking is not covered by the First Amendment but that the film itself—which could not exist but for the filmmaking—*is* protected would arbitrarily and "artificially disconnect an integral piece of the expressive process of filmmaking." *Price*, 514 F. Supp. 3d at 185; *see also Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017) ("The First Amendment protects actual photos, videos, and recordings, . . . and for this . . . to have meaning [it] must also protect the act of creating that material.").

The City does not effectively argue otherwise.  Instead, it simply contends that plaintiff has not alleged that its use of UAVs communicates any particularized message and, even if a particularized message was intended, it could not be discerned by anyone witnessing the conduct of flying UAVs.  The City's position misses the forest for the trees, oversimplifying both the scope of the First Amendment and the nature of Xizmo's at-issue conduct.

For one, Xizmo describes itself as a "full-service production company specializing in aerial cinematography" and alleges that it uses drones in New York City for purposes of filmmaking.  Compl. ¶¶ 1, 31.  Contrary to the City's contention, these allegations, standing alone, render it plausible that plaintiff's use of UAVs is intended to communicate a particularized political, social, or religious message since, as already noted, films, by their very nature, "affect public attitudes and behavior in a variety of ways, ranging from direct espousal of . . . social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Joseph Burstyn*, 522 U.S. at 501.[9]

---

[9] The inherently expressive nature of films also clearly distinguishes Xizmo's conduct from that in *Young v. N.Y.C. Transit Auth.*, 903 F.2d 146 (2d Cir. 1990), in which the Second Circuit held that the act of begging was not "inseparably intertwined with a particularized message" because

Further, any argument that Xizmo insufficiently alleged that its conduct of UAV use is intended to communicate a particularized message is belied by the affidavit submitted with plaintiff's opposition motion, which explains how Xizmo's "state of the art technology" allows directors, producers, actors, and even journalists to "express themselves artistically or inform on a matter of public interest using vantage points that only [drones] can provide." Kostakis Aff. ¶¶ 17–18. The affidavit goes on to describe several notable projects for which Xizmo's drones were essential and which plausibly convey a readily discernable message. *See, e.g.*, *id.* ¶ 17 (recounting Xizmo's participation in, *inter alia*, television show documenting New York City first responders during the COVID-19 pandemic and documentary film about the murder of a black teenager in Brooklyn). At this preliminary stage, these allegations, and the inferences that can be reasonably drawn from them, are clearly sufficient to warrant discovery.

Though the City presses this point mightily, a different conclusion is not warranted simply because the specific expressive messages interwoven in Xizmo's conduct are not immediately obvious to a person witnessing its drones fly through the New York City sky. Xizmo does not argue that the act of flying drones, on its own, conveys a discernable message to its viewers. As explained, its First Amendment claim rests on the basis that aerial cinematography is "inseparably intertwined" with each director's, producer's, actor's, and journalist's particularized message. Pl. Opp. Mem. at 11 (quoting *Young*, 903 F.2d at 153). The City's argument thus focuses too narrowly on Xizmo's literal operation of UAVs, rather than on their role in the filmmaking process, a process which, by generating expressive film with a particularized, discernable message, is constitutionally protected. In fact, applying the City's logic, the act of writing a novel would be excluded from First Amendment protection unless the

---

"most individuals who beg are not doing so to convey any social or political message." 903 F.2d at 153 (quotations omitted).

author's message were somehow apparent to a person watching her type on a keyboard. Expressive thought, in other words, cannot be constitutionally protected unless the media essential to its communication are also.

Finally, it is inconsequential that the Avigation Law does not directly address the protected activity of filmmaking; it may still run afoul of the First Amendment to the extent that it does so indirectly. "The fact that [a] statute's practical effect may be to discourage protected speech is sufficient to categorize [it] as an infringement on First Amendment activities." *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 255, 107 S. Ct. 616, 626, 93 L. Ed. 2d 539 (1986). First Amendment scrutiny still applies to statutes "which, although directed at activity with no expressive component, impose a disproportionate burden upon those engaged in protected First Amendment activities." *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 704, 106 S. Ct. 3172, 3176, 92 L. Ed. 2d 568 (1986); *see also Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 103 S. Ct. 1365, 75 L. Ed. 2d 295 (1983) (holding that a tax imposed on the consumption of large quantities of newsprint and ink violated the First Amendment by effectively singling out newspapers to bear the burden). For the reasons explained above, Xizmo has plausibly alleged that the Avigation Law operates in a similar way, indirectly suppressing protected filmmaking in New York City by banning aerial cinematography via drones.

B.     Intermediate Scrutiny

Of course, the First Amendment inquiry does not end there. To survive the City's motion to dismiss, Xizmo must also set forth facts that, if true, adequately establish that that the Avigation Law—which the parties agree is content-neutral—violates intermediate scrutiny. Under intermediate scrutiny, a "content-neutral regulation may restrict the time, place, and manner of protected speech, provided it is 'narrowly tailored to serve a significant governmental

interest' and 'leave[s] open ample alternative channels for communication.'" *Bery v. City of New York*, 97 F.3d 689, 697 (2d Cir. 1996) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989)).

To satisfy the first requirement of being narrowly tailored to serve a significant governmental interest, the law must advance an "important or substantial governmental interest" that is "unrelated to the suppression of free speech," and its "incidental restriction on alleged First Amendment freedoms" must be "no greater than is essential to the furtherance of that interest." *Turner Broad. Sys.*, 512 U.S. at 662 (cleaned up). Under this standard, the law "need not be the least speech-restrictive means of advancing the Government's interests," *id.*; what matters is whether the "regulation promotes a governmental interest that would be achieved less effectively absent the regulation," *Ward*, 491 U.S. at 799 (quotations omitted). At the same time, however, the law may not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.*

In arguing that the Avigation Law satisfies this requirement, the City asserts that in a densely populated city like New York, which is filled with skyscrapers and surrounded by three airports, it is "necessary and logical" to limit takeoff and landing sites "in order to maintain the safety and security of the City." Def. Mem. at 14. Delivering a death blow, however, the City does not even attempt to elaborate on what specific "safety and security" interests are implicated when FAA-certified pilots operate UAVs outside of the five public parks that the City claims to be designated take-off and landing areas. Nor does it explain how the three-quarters of a century-old Avigation Law, enacted the same year that JFK, then-Idlewild Airport, opened its doors and ten years before the FAA was created, is intended to curb any such safety risks. Without more, the City's generalized interests of safety and security are too nebulous to show that, as a matter of law, the Avigation Law is narrowly tailored. *See, e.g.*, *Turner Broad. Sys.*,

19

512 U.S. at 664 ("[The agency] must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way."); *Jones v. Stanford*, 489 F. Supp. 3d 140, 148 (E.D.N.Y. 2020) ("speculative assertions" of how statute advances an "undoubtedly substantial interest" insufficient to show narrow tailoring); *B & L Prods., Inc. v. 22nd Dist. Agric. Ass'n*, 394 F. Supp. 3d 1226, 1247 (S.D. Cal. 2019) ("vague claims" about "an interest in public safety" insufficient to show narrow tailoring). Simply put, a law cannot be "narrowly tailored to serve a significant governmental interest" if the City does not establish that the relevant interest is in fact jeopardized. *Ward*, 491 U.S. at 791. Although the City might ultimately carry the day on this point, its blank stare and screaming headlines about public safety, in the teeth of the FAA's determination that Xizmo may fly drones safely in approved portions of the City's airspace, will not do.

Going a step further, given the ample precautions that concurrently operate at the federal level, it cannot be said that the City's generalized safety interest "would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799. For instance, UAV flight is prohibited in Class B airspace (absent individual FAA authorization) which in turn means that UAV flight is prohibited in the majority of the City and around all of the surrounding airports.[10] 14 C.F.R. § 107.41; *see also id.* § 107.43 ("No person may operate a small unmanned aircraft in a manner that interferes with operations and traffic patterns at any airport, heliport, or seaplane base."). The FAA also imposes comprehensive regulations for "[l]imitations on operations over human beings," *Id.* § 107.105, and "[o]perations over moving vehicles," *Id.* § 107.145. Pointedly, to the extent that the FAA has permitted Xizmo to fly in the challenged New York

---

[10] La Guardia, JFK, and Newark airports are all within Class B airspace. *See* FAA, AERONAUTICAL INFORMATION MANUAL at § 3-2-3(b)(2)(h)–(j) (June 19, 2021), https://www.faa.gov/air_traffic/publications/media/aim_bsc_w_chg_1_2_dtd_5-19-22.pdf.

City airspace means that, it must be presumed, Xizmo's UAV flights in that airspace will meet all of the FAA's flight safety and air space control imperatives.  So far, the City has been silent about any specific safety concerns beyond them.

Although the City's motion to dismiss plaintiff's First Amendment claim fails on this basis alone, Xizmo has also plausibly alleged that the Avigation Law misfires constitutionally because it does not "leave open ample alternative channels for communication."  *Ward*, 491 U.S. at 791.  While the alternative channels need not be "perfect substitutes," *Mastrovincenzo*, 435 F.3d at 101, "a restriction on expressive activity may be invalid if the remaining modes of communication are inadequate," *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 812, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984).  That is, the alternative avenues of expression "must be more than merely theoretically available" and "realistic."  *Gresham v. Peterson*, 225 F.3d 899, 906 (7th Cir. 2000) (citing *Linmark Assocs., Inc. v. Twp. of Willingboro*, 431 U.S. 85, 93, 97 S. Ct. 1614, 52 L. Ed. 2d 155 (1977)).

On this point, the City suggests that helicopters, cranes, and filming from the top of buildings are sufficient aerial cinematography alternatives to UAVs.  Plaintiff responds by arguing that both helicopters and cranes are more expensive than UAVs, and, as such, they are not a practical option for many directors.  *See* Pl. Opp. Mem. at 14; Kostakis Aff. ¶¶ 20, 22.  In addition, plaintiff contends that all three alternatives cannot capture the same range of shots as UAVs and are therefore significantly less effective at conveying a director's message.  Kostakis Aff. ¶¶ 21–22; *see Linmark*, 431 U.S. at 93 (holding that ban on "For Sale" signs did not leave open ample alternatives where remaining options, like newspaper advertising, involved "more cost and less autonomy" and "may be less effective media for communicating the message" conveyed by a "For Sale" sign).  Beyond the *prima facie* persuasiveness of plaintiff's responses, the City's asserted alternatives ultimately implicate factual issues that cannot be resolved on a

motion to dismiss.  *See Financial Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015).  Discovery is therefore required to properly ascertain the cost and efficacy of these proposed substitutes.

Nor does the purported availability of five designated take-off and landing sites satisfy the ample alternative requirement as a matter of law.  Even assuming *arguendo* that UAV use is permitted at these allegedly designated areas in a handful of City parks, filming Rockaway Beach from Marine Park, for instance, is not comparable to filming the world-renowned skyscrapers of Manhattan.  *See Million Youth March, Inc. v. Safir*, 18 F. Supp. 2d 334, 347 (S.D.N.Y. 1998) ("The requirement that potential alternatives be 'ample' requires a nuanced analysis that may take account of (1) the audience to which the speaker seeks to communicate and (2) *the contribution of the desired location to the meaning of the speech*." (emphasis added) (citations omitted)).  Just as holding a protest calling for "an end to the violence and conflict in communities of color" on Randall's Island cannot communicate the same message as holding the identical protest march on Malcolm X Boulevard in Harlem, filming in the five remote Brooklyn, Queens, and Staten Island locations cannot communicate the same message as filming in Manhattan.  *See, e.g.*, *Safir*, 18 F. Supp. 2d at 336, 348.  Likewise, as plaintiff points out, film and journalism consumers typically associate New York with its "soaring skyscrapers, bustling streets, and historic locations," which makes filming in Manhattan all the more important for those seeking to convey New York-specific messages.  Pl. Opp. Mem. at 15.

The short of it is simply this:  because it remains to be seen whether the Avigation Law, at least, as applied to UAV pilots with FAA certification and the appropriate waivers, is "narrowly tailored to serve a significant governmental interest" and "leave[s] open ample alternative channels of communication," it cannot be held, as a matter of law, that intermediate

scrutiny is satisfied.  *Ward*, 491 U.S. at 791.  This, plus the expressive nature of Xizmo's UAV

use, precludes dismissal of plaintiff's First Amendment claim under Rule 12(b)(6).

Conclusion

For the foregoing reasons, defendant's motion to dismiss is denied.  Plaintiff may

proceed with its conflict preemption claim and First Amendment claim.

The parties are directed to contact the chambers of Magistrate Judge Marcia M. Henry to

arrange for further pretrial management of this case.

So Ordered.

Dated: Brooklyn, New York
         August 25, 2022

                                                    */s/ Eric N. Vitaliano*
                                                    ERIC N. VITALIANO
                                                    United States District Judge